O

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DCS MARKETING, | ) | CASE NO. SACV 09-0144 DOC(MLGx) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **O R D E R GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| THE HOMER LAUGHLIN CHINA COMPANY et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Before the Court is Defendant The Homer Laughlin China Company's ("HLC" or "Defendant") Motion for Partial Summary Judgment ("Motion"). After considering the moving, opposing and replying papers, as well as the parties' oral argument, and for the reasons that follow, the Court hereby GRANTS IN PART AND DENIES IN PART Defendant's Motion.

## I.   BACKGROUND

Defendant HLC is a manufacturer of dinnerware with its principal place of business in Newell, West Virginia. HLC manufactures dinnerware for sale to individuals and also has a separate business line for sales to restaurants, hotels, and other institutions. This case involves the

sales of dinnerware to restaurants, hotels, and other institutions.  On February 14, 2006, Plaintiff, DCS Marketing ("Plaintiff" or "DCS") entered into a written contract with Defendant.  Def.'s Resp. to Statement of Genuine Issues of Disputed Fact in Opp. to Mot. ("U.F.") ¶ 32.  DCS is a manufacturer's sales representative for a wide range of products including curtains for institutional walk-in freezers, convection ovens, juicers, knifes, and grills.  *Id.* ¶ 16.  DCS is owned by Dennis Solomon.  *Id.* ¶ 17.  DCS had a working relationship with Dennis Dominic, the principal of VNI, LLC.  *Id.* ¶ 18.  Dominic entered into a verbal agreement with Solomon to represent HLC under the DCS name.  *Id.* ¶ 31.

Through the contract, DCS agreed to sell HLC's chinaware and represent DCS as a sales representative in the Nevada and Southern California regions.  The written contract set forth the particular commissions that DCS would receive for different types of orders.  For instance, DCS was to receive a 10% commission on Ameriwhite products and an 8% commission on Fiesta products.  *Id.* ¶ 32.  The contract also set forth that "[c]ommission rates for special contract patterns and/or split commission orders are handled on an individual basis."  *Id.*  DCS was to receive commission for orders received beginning February 20, 2006.  *Id.*

HLC's national sales are managed by Richard Blatchford, the General Sales Manager. *Id.* ¶ 9.  DCS was supervised by HLC's Regional Sales Manager for the Western United States, Pamela Perkins.  *Id.* ¶ 13.  In Southern California, HLC also employs a District Sales Manager, Sandy Coye ("Coye").  *Id.* ¶ 14.

HLC terminated the contract by letter on May 14, 2008, termination effective on June 2, 2008, but the termination is not at issue in this action.  DCS makes four allegations of wrongful commissions withholdings by HLC pursuant to its contract: "(1) it did not receive a commission on a sale to the Westin Bonaventure Hotel in Los Angeles; (2) deductions were taken from its commissions and paid to Sandy Coye; (3) it did not receive a commission for sales to the Cheesecake Factory; and (4) it did not receive the full amount of commissions owed for sales made to customers that were handled through Wasserstrom, a dealer."  *Id.* ¶ 67.  DCS has alleged three causes of action for breach of contract, violation of the Independent Wholesale Sales Representatives Act, and accounting.  HLC's Motion for Partial Summary Judgment only seeks

1 | summary judgment as to the second cause of action, violation of the Independent Wholesales
2 | Sales Representatives Act.

3 | **II.    LEGAL STANDARD**

4 |      Summary judgment is proper if "the pleadings, the discovery and disclosure materials on
5 | file, and any affidavits show that there is no genuine issue as to any material fact and that the
6 | movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

7 |      The Court must view the facts and draw inferences in the manner most favorable to the
8 | non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993 (1962);
9 | *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the
10 | initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need
11 | not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct.
12 | 2505 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S. Ct. 2548 (1986). When the
13 | non-moving party bears the burden of proving the claim or defense, the moving party can meet its
14 | burden by pointing out that the non-moving party has failed to present any genuine issue of
15 | material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

16 |      Once the moving party meets its burden, "an opposing party may not rely merely on
17 | allegations on denials or its own pleading; rather, its response must–by affidavits or as otherwise
18 | provided in this rule–set out specific facts showing a genuine issue for trial. If the opposing party
19 | does not so respond, summary judgment should, if appropriate, be entered against that party. FED.
20 | R. CIV. P. 56(e)(2); *see also Anderson,* 477 U.S. at 248-49. Furthermore, a party cannot create a
21 | genuine issue of material fact simply by making assertions in its legal papers. There must be
22 | specific, admissible evidence identifying the basis for the dispute. *S.A. Empresa de Viacao Aerea*
23 | *Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980). The Supreme
24 | Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there
25 | must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*,
26 | 477 U.S. at 252.

27 | **III.    DISCUSSION**
28 |      **A.    Applicability of the Independent Wholesale Sales Representatives**

3

**Contractual Relations Act**

Defendant argues that summary judgment should be granted on the second cause of action because the Independent Wholesale Sales Representatives Contractual Relations Act ("the Act") does not apply to the parties' contract.  Specifically, Defendant argues that Plaintiff is not a "wholesale sales representative" as defined by the Act.  Cal. Civ. Code § 1738.12(e).  The Act defines "wholesale sales representative" as "any person who contracts with a manufacturer, jobber, or distributor for the purpose of soliciting wholesale orders, is compensated, in whole or part, by commission, but shall not include one who places orders or purchases exclusively for his own account for resale and shall not include one who sells or takes orders for the direct sale of products to the ultimate consumer."  *Id.* at § 1738.12(e).

The parties do not dispute that DCS contracted with the manufacturer, HLC, for the purpose of soliciting orders of HLC's china and that DCS was compensated by commission. However, Defendant argues that DCS made direct sales from the ultimate consumer to HLC, not wholesale orders.  In contrast, Plaintiff argues that sales by DCS were submitted through wholesale dealer-distributors and were thereby wholesale orders, not direct orders from the consumers.  It is undisputed that the "general process" through which orders were processed was that DCS would procure an order from an ultimate customer; DCS would then provide the order to a dealer-distributor; and the dealer-distributor would then prepare a purchase order which the dealer then provided to HLC.  U.F. ¶ 55.  Both parties agree that this process was put in place for "HLC's distribution and accounting purposes."  *Id.* ¶ 42.  The daily orders summary exchanged between HLC and DCS listed sales by DCS both to dealers and to end customers. *Id.* ¶ 64.  The parties also agree that when an order was submitted through a dealer, the sales representative was paid a commission based on the dinnerware orders invoiced to that dealer.  *Id.* ¶ 63.

The parties also do not dispute that the focus of DCS's sales activities was on the ultimate consumer. U.F. ¶ 46.  DCS interacted with the ultimate consumers, who were restaurants, hotels, and other institutions, to sell dinnerware that the restaurants, hotels, and other institutions would then use in the course of their business. *Id.* ¶ 46.  These customers solicited by DCS were the ultimate consumers of the dinnerware.

1    However, the parties do dispute the legal significance of the fact that generally orders were

2    processed through a dealer-distributor and were not submitted directly to HLC.  Because the

3    material facts regarding this aspect of the parties' relationship are not in dispute, the Court turns to

4    a legal analysis of whether Plaintiff is a "wholesale sales representative" under the Act.  The

5    parties dispute whether DCS was "soliciting wholesale orders" and whether DCS falls into the

6    second exception to the definition of "wholesale sales representatives."  Defendant argues that

7    Plaintiff does not fall within the Act because Plaintiff was not in the business of "soliciting

8    wholesale orders" as required by the Act.  Cal. Civ. Code § 1738.12(e).  Defendant also argues

9    that the second exception of the Act, for "one who sells or takes orders for the direct sale of

10   products to the ultimate consumer," applies to DCS.  *Id.*  Therefore, the key analysis is whether

11   the actions of DCS actually constitute wholesale orders or orders for the direct sale of products to

12   the ultimate consumer.[1]  This analysis is complicated by the role of dealer-distributors in the sales

13   process.  Dealers are companies that sell a variety of products to hotels and restaurants.  U.F. ¶ 21.

14   Because these dealers also sell multiple lines of dinnerware that compete with HLC, HLC uses

15   their sales representatives such as DCS to bring orders from the ultimate consumer to the dealer.

16   *Id.* ¶ 42.

17   DCS is only a wholesale sales representative if it contracted with HLC "for the purpose of

18   soliciting wholesale orders."  Cal. Civ. Code §1738.12(e).  Defendant argues that soliciting orders

19   from customers that would use the product in their own operations does not constitute soliciting

20   wholesale orders.  In other words, Defendant argues that because DCS took orders directly from

---

22   [1]    Defendant cites two cases, *Zauderer v. C & J Industries, Inc.*, 378 F. Supp.

23   2d 682 (D. S.C. 2005) and *Robbins & Myers, Inc. v. Winger Assoc., Inc.*, 874 F. Supp.
     252 (D. Minn. 1993), for the proposition that in analogous cases, courts have held that

24   sales to manufacturers do not constitute wholesale sales, even though they are not
     retailers. Def. Reply at n. 1. Defendants cite these cases to refute Plaintiff's contention

25   that because it does not solicit retailers or collect retail sales taxes, it must be a

26   wholesaler. *Id.*  Because the Court does not base its ruling on this contention of Plaintiff,
     the Court will not discuss the applicability of those cases.  To the extent that they are also

27   used to support the contention that DCS solicited end users of the product, that fact is not

28   in contention.

1   the consumers, the orders were not wholesale orders.  The Act itself does not define wholesale and
2   no published case has interpreted the meaning of "wholesale" under the Act.  The dictionary
3   defines wholesale, when used as an adjective, as "of, relating to, or engaged in the sale of
4   commodities in quantity for resale."  Merriam-Webster Online Dictionary, 2009.  The key inquiry
5   under this definition is whether DCS was involved in the sale of items for resale purposes or for
6   direct sale purposes.

7   The second exception set forth in the Act also turns to whether the sales at issue were direct
8   sales.  The Act does not apply to a representative "who sells or takes orders for the direct sale of
9   products to the ultimate consumer."  Cal. Civil Code § 1738.12(e).  For a sales representative to
10  fall under this second exception to the Act, the representative must make a direct sale to the
11  ultimate consumer.

12  The applicability of Plaintiff's claim to the Act as to the sale passed through the dealers,
13  then, depends upon whether DCS has procured direct sales from the ultimate consumer or whether
14  DCS procured resales given the involvement of the dealer-distributor in processing the sales.
15  HLC's own statements regarding the relationship between DCS and the dealers are most telling.
16  Therefore, the Court looks to the purpose set forth by HLC for creating a sale representative who
17  interacts with the ultimate consumer but must pass all sales through the wholesale
18  dealer-distributor.  HLC states that orders procured by DCS from ultimate consumers are
19  processed by dealers "[f]or distribution and accounting purposes."  U.F. ¶ 42.  HLC also states that
20  "because the Dealers also sell competing dinnerware lines, it is a critical function" of the sales
21  representatives to "bring orders from the end users to the Dealer."  *Id*.  HLC's statement reveals
22  that the purpose of DCS's interaction with the end customer is to increase the orders that HLC
23  receives from the dealers.  In other words, DCS is meant to increase wholesale orders from the
24  dealers.

25  HLC strenuously argues that the Act focuses solely on the actions of the sales
26  representative, not the representative's relationship with the manufacturer or dealer-distributor.
27  However, the plain language of the Act states that the taking of orders for the *direct* sale of
28  products to the ultimate consumer is excluded from the Act.  The term "direct" modifies the sales,

not the taking of orders by the representatives.  The term "direct" is also particularly meaningful in the context of this statute regarding wholesale orders, which are by definition resale orders.  In this context, direct pertains to the *type* of sale–direct or resale–not the relationship between the sales representative and the consumer.  HLC has set up the ordering system such that orders are processed through the dealers.  The effect of the process is that orders pass through the dealer and are no longer direct orders that the sales representative sends to the manufacturer.  DCS's activity in passing through the orders thus falls outside of the second exception of the Act and constitutes "soliciting wholesale orders."

Defendant further argues that only one direct sale of products to an ultimate consumer by DCS would preclude DCS from being protected by the Act.  The text of the Act supports this reading.  The definition of "wholesale sales representative" sets forth two exceptions.  The first exception is for a representative "who places orders or purchases exclusively for his own account for resale." *Id.* at § 1738.12(e).  The second exception is for a representative "who sells or takes orders for the direct sale of products to the ultimate consumer." *Id.*  While the first exception to the "wholesale sales representative" definition requires that sales be placed for the representatives own account *exclusively*, the second exception for representatives who make sales to the ultimate consumer does not include a mirror requirement that sales be made exclusively to the ultimate consumer.  Therefore, a contextual plain language reading of the text directs that a representative who makes *any* sales directly to the ultimate consumer is not a "wholesale sales representative" under the Act.  To the extent that HLC can prove that DCS made a direct sale to an ultimate consumer, the Act does not apply because DCS would no longer qualify as a "wholesale sales representative."

However, at the summary judgment stage HLC must also demonstrate the genuine absence of a material fact as to the fact that DCS has taken a single order for the direct sale of products to the ultimate consumer.  It is undisputed that passing orders through dealers is not the only method through which orders were placed by HLC sales representatives.  U.F. ¶ 65.  The parties agree that a second method was used to process orders.  *Id.*  This method was that a sales representative would procure orders that were processed directly from the end user to HLC.  *Id.*  However, DCS

disputes that it ever procured any direct sales under this alternative method.  *Id*. ¶ 66; Dennis Solomon Decl. ¶¶ 6-8, 11-13.  In his declaration, Dennis Solomon states that "[a]ll sales other than a very few which predated the subject contract with DCS went through distribution" and "[a]ny direct orders from the ultimate consumer to the factory . . . were not orders that were sold or taken by DCS; they predated DCS' contract with Homer Laughlin."  Solomon Decl. ¶¶ 6, 11.

While HLC recognizes that DCS disputes this fact, it states that the "record evidence shows that DCS was involved in, and paid commissions for the direct sale of product to ultimate consumers."  U.F. ¶ 66.  As support for this statement, HLC cites several sources.  First, it cites the affidavit of Richard Blatchford, which states, "There were several end users in DCS' territory which involved the directs sale of product from HLC to the end user, which included the Sheraton Hotel in Pasadena; Pepperdine University; Harvey Mudd College; Tony's on the Pier; and Garden Fresh.  In such situations, DCS's commissions would be based solely on the sale to that end user."  Richard Blatchford Decl. ¶ 16.  HLC also provided documentary evidence purportedly showing the commissions provided to DCS for direct sales to ultimate consumer Garden Fresh, and Defense counsel attempted to explain the relationship of these pieces of evidence at oral argument.  Supp. Peter Ennis Decl. ¶¶ 6-7; Def. Exh. 29-31.  These exhibits are emails between Perkins of HLC, Solomon and another DCS employee regarding the Garden Fresh business; DCS' Monthly Marketing Report indicating marketing work DCS had completed regarding the Garden Fresh Account and commission statements to Solomon reflecting payments for "Garden," presumably the Garden Fresh account.  However, while the exhibits do indicate that DCS interacted with the ultimate customer, Garden Fresh, the exhibits fail to establish whether DCS took orders from Garden Fresh directly to HLC or whether they were procured through a dealer.  Thus, the Court is left with the conflicting affidavits from Blatchford and Solomon regarding whether DCS ever took any direct orders.  As genuine issues of material fact exist as to whether DCS took any direct orders from the ultimate consumers, Defendant's Motion for Summary Judgment as to the applicability of the Independent Wholesale Sales Representatives Contractual Relations Act of 1990 is DENIED.

**B.     Availability of Treble Damages**

Defendant also requests summary judgment regarding the availability of treble damages under the Act.  Treble damages are available against any manufacturer who "willfully fails to enter into a written contract as required by this chapter or willfully fails to pay commissions as provided in the written contract." Cal. Civ. Code § 1738.15.  The Act does not define the meaning of "willfully," and despite the fact that the Act was passed nearly twenty years ago, there is no published opinion interpreting the willfulness requirement under the Act.  The Court applies California rules of statutory construction in interpreting the Act's provisions.  *In re Kolb*, 326 F.3d 1030, 1037 (9th Cir. 2003).  In interpreting a California statute, "[i]n most instances, the words of the statute, in their usual and ordinary import, provide the most reliable indication of legislative intent."  *Id.* (citing *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 527 (9th Cir.2001)).  Furthermore, the statute's meaning is ambiguous, "'a court may consider extrinsic evidence of the legislature's intent,' such as the history and apparent purpose of the provision in the context of the statute in its entirety.  *Id.* (citing *In re First T.D. & Inv., Inc.*, 253 F.3d at 527).

Black's Law Dictionary defines "willful" as "voluntary and intentional, but not necessarily malicious."  8th ed. (2004).  In addition, in this case the Court need not look outside the text of the statute to find the legislature's intent.  The California legislature specifically set forth the purpose of the Act in the "Legislative findings, declarations and intent" section of the Act, which states:

> The Legislature finds and declares that independent wholesale sales representatives are a key ingredient to the California economy. The Legislature further finds and declares the wholesale sales representatives spend many hours developing their territory in order to properly market their products, and therefore should be provided unique protection from unjust termination of the territorial market areas. Therefore, it is the intent of the Legislature, in enacting this act to provide security and clarify the contractual relations between manufacturers and their nonemployee sales representatives.

Cal. Civil Code § 1738.10.  The combination of the plain wording of the statute and the declared purpose of the Act–to provide security and clarity in contractual relations–supports a reading of

1    wilfullness that does not require the Act be violated maliciously.  The violation need only be

2    voluntary and intentional.

3         Defendants argue that the definition of willful should also include a good faith exception.

4    In support, Defendant offers a single unpublished case from the California Court of Appeal which

5    has addressed this issue–*Niroozfar v. SAS Textile, Inc.*, No. B151357, 2002 WL 31831709 (Cal.

6    Ct. App. Dec. 18, 2002).  In *Niroozfar*, the California Court of Appeal interpreted the "willful"

7    requirement of California Civil Code § 1738.15 to be the same as the willful requirement of

8    California Labor Code § 203.   Under this interpretation, actions are not willful if there is a good

9    faith dispute regarding liability, meaning that the "employer presents a defense, based on law or

10   fact which, if successful, would preclude any recovery on the part of the employee."  *Id.* at *7.

11   Plaintiffs, on the other hand, provide the Court with no proposed definition of willfulness, but

12   based on their briefing it appears that they encourage a reading of willful as intentional, without

13   any good faith exception.  In any event, Plaintiff also appears to dispute that any violations were

14   made in good faith.  Plaintiff also argues that the question of willfulness is one for the jury.  The

15   Court is persuaded by the reasoning of *Niroofzar.*  It is reasonable to take notice of the

16   legislature's action in an analogous situation and conclude that the legislature intended the same

17   meaning of "willful" to apply in two labor statutes.  In addition, there is no legislative history to

18   the contrary.  Therefore, the Act's provision of treble damages in the case of willful violations

19   contains a good faith exception.

20        The Act provides for treble damages in two circumstances: (1) when a person "willfully

21   fails to enter into a written contract as required by this chapter;" and (2) when a person "willfully

22   fails to pay commissions as provided in the written contract."  Cal. Civ. Code § 1738.15.

23   Defendant argues that any violation through a failure to enter into a written contract as required by

24   the Act was not willful.  Defendant argues that because there are no judicial decisions that have

25   interpreted the phrase "wholesale sales representative" in the contest of the facts of this case,

26   "where Dealers are used for accounting and distribution purposes but the Sales Rep is soliciting

27   the ultimate consumer," Defendant made a good faith interpretation of the applicability of the Act.

28   Mot. at 22.  The Court agrees that this is a case of first impression and the state of the law guiding

Defendant was unclear. As discussed above, Defendant has presented a defense that the Act did not apply because of the exception it provides for sales to ultimate consumers. The parties agree that the focus of DCS's sales activities was on the ultimate consumer. U.F. ¶ 46. Because of HLC's sales representatives' undisputed focus on the ultimate consumer, the Court finds that Defendant has presented a good faith defense based on the law which would have (and, in the event HLC is able to demonstrate a direct sale between DCS and HLC, still could) precluded coverage under the Act. Therefore, as a matter of law treble damages are not available for any violations of Defendant's to provide a written contract as required by the Act.

However, treble damages are also available when a person "willfully fails to pay commissions as provided in the written contract." Cal. Civ. Code § 1738.15. Plaintiff claims four failures to pay commissions. These four claims for sales to the Bonaventure Hotel; deductions for HLC employee Sandy Coye; sales to the Cheesecake Factory; and sales through Wasserstrom. Defendant argues that all of these alleged failures are also subject to the good faith exception because DCS followed the same procedures with all of its other sales representatives and subjectively did not believe that it owed DCS those amounts. Mot. at 24.

The first alleged failure to pay commissions was for the Bonaventure Hotel. HLC states that this commission was not paid because Bonaventure was a special contract pattern, citing evidence that the product was sold for 80% less than list price. U.F. ¶ 69. However, DCS disputes this claim, stating that the Bonaventure product was stock, not custom, and therefore would not have fallen under the "special contract patterns" term of the contract. *Id.* DCS also presented a declaration that Coye repeatedly promised DCS that it would get paid for Bonaventure. *Id.*

The third alleged failure was for sales to the Cheesecake Factory. HLC states that the Cheesecake Factory sales involved a special contract pattern and that no other sales representatives have been paid for that business. U.F. ¶ 74-75. DCS disputes this by affidavit, saying that the Cheesecake Factory purchased stock items, so the product was not a "special contract pattern." *Id.* For these two failures to pay commissions, the parties clearly dispute the meaning of the contract's "special contract pattern" clause. They have not presented evidence to

the meaning of that clause in this summary judgment motion.  Without a discussion about and interpretation of the meaning of that clause, which at this point the Court is unequipped to make, the Court cannot as a matter of law determine that Defendant's arguments that the clause applies were made in good faith.  Therefore, summary judgment is not appropriate and a genuine issue for trial remains.

The second alleged failure was for the deductions for HLC employee Sandy Coye.  HLC admits that it made a mistake by not putting Coye's commission in the contract.  *Id.* ¶ 70.  DCS's apparent only defense, based on law or fact, to the failure to pay the commissions, is that it offered to pay DCS half of the amount DCS thought it was owed and that DCS left Coye's commission off of other similar contracts.  Mot. at 24.  These statements are insufficient to prove a good faith defense as a matter of law at the summary judgment stage.

The final alleged failure was for failure to pay commissions for Wasserstrom.  It is undisputed that HLC was unable to get a breakdown from Wasserstrom that set forth which products were being set forth to which territory, so it did not pay its sales representatives for the amount in their territory.  *Id.* ¶ 76.  Again, this undisputed fact is insufficient to establish good faith as a matter of law.

Therefore, Defendant is entitled to summary judgment as to the availability of treble damages for violation of the Act by willfully failing to enter into a written contract as required by the Act but not for willfully failing to pay commissions as provided in the written contract.

## IV.  DISPOSITION

For the foregoing reasons, Defendant's Motion is GRANTED as to the availability of treble damages for violation of the Act by willfully failing to enter into a written contract and DENIED

as to the applicability of the Act and as to the availability of treble damages for willfully failing to pay commissions as provided in the written contract.


IT IS SO ORDERED.

DATED: November 10, 2009


_David O. Carter_

_____
DAVID O. CARTER
United States District Judge